IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA
Norfolk Division

UNITED STATES OF AMERICA,

v.                                                                            Criminal Action No. 2:21cr98

HERSON BARRERA-VASQUEZ,
    Defendant.

### MEMORANDUM OPINION

This matter comes before the Court on Defendant Herson Barrera-Vasquez's motion to dismiss the indictment against him. (ECF No. 14.) Barrera-Vasquez contends that 8 U.S.C. § 1326—which criminalizes the reentry of removed aliens—violates the Fifth Amendment's equal protection guarantee. (*Id.*) He asserts that Congress enacted § 1326 "with a discriminatory purpose" and that the law disparately affects Latinx persons.[1] (*Id.* at 1.) Accordingly, he contends that the Court must find § 1326 unconstitutional as a violation of his right to equal protection under *Village of Arlington Heights v. Metropolitan Housing Development Corporation*, 429 U.S. 252 (1977). (*Id.*)

Barrera-Vasquez requests an evidentiary hearing to present additional evidence and argument. (ECF No. 22, at 2.) Having reviewed and considered the briefings and exhibits filed by the parties, the Court finds that the parties have adequately presented their legal and factual contentions to the Court.[2] Whether reviewed under the rational basis test or the more demanding

---

[1] Although Barrera-Vasquez's motion argues that Latinx individuals collectively bear the burden of § 1326, the supporting materials speak largely about issues dealing with Mexican immigration. (*See id.* at 26–27.) The Court notes that Barrera-Vasquez is not Mexican; he is from El Salvador.

[2] *See* Local Crim. R. 47(J); *see also, e.g., United States v. Ruben Javier Cac-Chon*, No. 3:20cr61, ECF No. 27, at 1 (E.D. Va. Nov. 10, 2020); *United States v. Zepeda*, No. CR20-57, 2021 WL 4998418, at *1 (C.D. Cal. Jan. 5, 2021); *United States v. Lucas-Hernandez*, No. 19mj24522,

*Arlington Heights* framework, § 1326 does not cross the line to violate equal protection.

# I. BACKGROUND

In August 2014, the government removed Barrera-Vasquez to El Salvador following his conviction for an aggravated felony. (ECF No. 1.) According to the indictment, Barrera-Vasquez eventually unlawfully returned to this country, the authorities caught him, and a grand jury charged him with reentry by a removed alien in violation of § 1326.[3] (ECF No. 1.) Barrera-Vasquez then moved to dismiss the indictment.[4] (ECF No. 14.)

Congress initially criminalized unauthorized reentry following removal in the Undesirable Aliens Act of 1929 (the "UAA"). In 1952, Congress enacted § 1326 as part of the Immigration and Nationality Act (the "INA"). In doing so, it adopted the language of the UAA, largely unchanged.[5] At the time of its passage, § 1326 provided in pertinent part that:

---

2020 WL 6161150, at *4 (S.D. Cal. Oct. 21, 2020); *United States v. Novondo-Ceballos*, 554 F. Supp. 3d 1114, 1123 (D. N.M. Aug. 12, 2021); *United States v. Sanchez-Felix*, No. 21cr310, 2021 WL 6125407, at *8 (D. Colo. Dec. 28, 2021) (finding no evidentiary hearing necessary in similar cases).

The Court notes that other defendants have recently mounted similar challenges to §§ 1325 and 1326 across the country. Two recent cases, including this Court's denial in *United States v. Palacios-Arias*, currently pend before the Fourth Circuit. *See* Civil Action No. 3:20cr62, (E.D. Va. Jan. 8, 2021); Case No. 21-4020 (4th Cir. 2021). Of the numerous district courts to consider these arguments, the Court has identified only one case holding § 1326 unconstitutional. *Compare United States v. Munoz-De La O*, No. 2:20cr134, __F. Supp. 3d__, 2022 WL 508892, at *7 n.13 (E.D. Wash. Feb. 18, 2022) (collecting cases denying similar motions), *with United States v. Carrillo-Lopez*, 555 F. Supp. 3d 996, 1027 (D. Nev. Aug. 18, 2021) (holding § 1326 unconstitutional).

[3] *See* 8 U.S.C. § 1326(b)(2) (providing heightened punishment for unlawful reentry following conviction for an aggravated felony).

[4] By Order entered September 21, 2021, the Court continued the trial generally pending resolution of Barrera-Vasquez's motion. (ECF No. 17); 18 U.S.C. § 3161(c)(1), (h)(1)(D).

[5] "Before § 1326 was enacted, three statutory sections imposed criminal penalties upon aliens who reentered the country after deportation." *United States v. Mendoza-Lopez*, 481 U.S. 828, 835 (1987). Barrera-Vasquez's motion addresses only the reentry provision contained in the

> [a]ny alien who . . . has been arrested and deported or excluded and deported, and thereafter . . . enters, attempts to enter, or is at any time found in, the United States . . . shall be guilty of a felony, and upon conviction thereof, be punished by imprisonment of not more than two years, or by a fine . . . or both.

INA, Pub. L. No. 82-414, § 276, 66 Stat. 163, 229 (1952). Since then, Congress has reauthorized and amended the illegal reentry provision multiple times, most recently in 1996.[6] Each time, Congress has either expanded or strengthened the law's punitive effect.

## II. DISCUSSION

Barrera-Vasquez presents four main arguments. First, he asserts that the Court must evaluate his equal protection challenge under the heightened standard of *Arlington Heights* instead of the "rational basis review" typical in immigration cases. (ECF No. 14, at 3–5; *see also* ECF No. 22, at 3–6.) Under *Arlington Heights*, a statute adopted with discriminatory intent (and discriminatory effect) violates equal protection. Second, he argues that, because Congress criminalized illegal reentry in the UAA for discriminatory reasons, the law's current codification under § 1326 is "presumptively unconstitutional."[7] (ECF No. 14, at 2.) In support, Barrera-Vasquez provides a historical analysis of the UAA's passage, and he cites the government's

---

UAA.

[6] *See* Anti-Drug Abuse Act of 1988, Pub. L. No. 100-690, § 7345(a), 102 Stat. 4471 (1988); Immigration Act of 1990, Pub. L. No. 101-649, § 543(b)(3), 104 Stat. 5059 (1990); Violent Crime Control and Law Enforcement Act of 1994, Pub. L. No. 103-322, § 130001(b), 108 Stat. 2023 (1994); Antiterrorism and Effective Death Penalty Act of 1996, Pub. L. No. 104-132, §§ 401(c), 438(b), 441(a), 110 Stat. 1267, 1276, 1279 (1996); Omnibus Consolidated Appropriations Act of 1997, Pub. L. No. 104-208, §§ 305(b), 308(d)(4)(J), (e)(1)(K), (14)(A), 324, 110 Stat. 3009-606, 3009-618 to 620, 3009-629 (1996).

[7] In October of 2020, this Court denied a similarly situated defendant's motion to dismiss his indictment for illegal reentry under § 1326. *See Palacios-Arias*, No. 3:20cr62, ECF NO. 37 (E.D. Va. Oct. 13, 2020). In *Palacios-Arias*, the defendant exclusively pointed to evidence of racial animus surrounding the statute's original enactment in 1929.

3

concession, in a similar case, that Congress passed the UAA for discriminatory reasons.[8] (ECF No. 14, at 5.) Third, Barrera-Vasquez argues that Congress's "discriminatory problem" in 1929 "was not fixed" when Congress recodified the law in 1952. (*Id.* at 2.) Here, he relies heavily on the Supreme Court's opinion in *Ramos v. Louisiana*,[9] asserting that under *Ramos*, this Court must "examine racial motivations of [the] law at the time of its [original] passage" because "later reenactments do not cleanse the law of its original taint" absent clear congressional intent to repudiate its prior motivations. (ECF No. 14, at 25.) Finally, Barrera-Vasquez argues that "racial animus was also a motivating factor in the [passage of the] 1952 law." (*Id.* at 2.) He provides a history of the events leading up to the passage of the INA in 1952 and again cites the record in *Carrillo Lopez*.[10] "At [the] hearing, two experts testified as to the discriminatory history of the 1929 law and 1952 recodification, as well as the disparate impact on Latinx individuals." (ECF No. 14, at 3.) In that case, a Nevada district court struck down § 1326 as unconstitutional under *Arlington Heights*.[11] Barrera-Vasquez asks the Court to do the same and dismiss the indictment against him.

---

[8] *See Carrillo-Lopez*, 555 F. Supp. 3d at 1007. *But see* (ECF No. 19, at 31 n.13) (Government's Response in Opposition) ("At oral argument in *Carrillo-Lopez*, the government conceded that the defendant had presented enough evidence to prove that the 1929 Act was passed out of a discriminatory intent. [*See* 555 F. Supp. 3d 996, 1007 n.17.] Based on the evidence presented by Barrera-Vasquez in this case, the government does not agree that he has established that point.").

[9] 140 S. Ct. 1390 (2020).

[10] Upon Barrera-Vasquez's request, the Court accepts the *Carrillo-Lopez* transcript, (ECF No. 15), and the affidavit of Dr. S. Deborah Kang, (ECF No. 22-1), and incorporates them into the record.

[11] *See also United States v. Vasquez-Ortiz*, No. 3:21cr23 (D. Nev. Sep. 23, 2021). *But see United States v. Salas-Silva*, No. 3:20cr54, 2022 WL 2119098 (D. Nev. June 13, 2022).

### *A. Standard of Review*

The parties offer two distinct analytical tools to review the constitutionality of § 1326 under the Equal Protection Clause. The government contends that the Court should apply rational basis review; Barrera-Vasquez wants the Court to find the statute unconstitutional because Congress adopted it for a discriminatory purpose.

A great deal of authority supports the government's position that the Court should apply rational basis review. The Supreme Court has "firmly and repeatedly endorsed the proposition that Congress may make rules as to aliens that would be unacceptable if applied to citizens." *Demore v. Kim*, 538 U.S. 510, 522 (2003). Accordingly, courts typically apply rational basis review when considering the constitutionality of immigration laws. *See Midi v. Holder*, 566 F.3d 132, 137 (4th Cir. 2009) ("Although courts usually subject national-origin classifications to strict scrutiny, when such classifications involve unadmitted aliens in the immigration context, we subject them only to rational basis review."); *Appiah v. U.S. Immigr. & Nat'y Serv.*, 202 F.3d 704, 710 (4th Cir. 2000) (finding strict scrutiny inapplicable to a stop-time rule challenge because "Congress can favor some nationalities over others in immigration law"); *see also United States v. Carpio-Leon*, 701 F.3d 974, 982 (4th Cir. 2012)(applying rational basis review to illegal alien's Fifth Amendment challenge to a law criminalizing possession of firearms because "no fundamental constitutional right [was] at stake").

The government argues that the Court should apply "ordinary rational basis" review in this context because the plenary power doctrine mandates extreme judicial deference to Congress regarding matters of immigration and naturalization. (ECF No. 19, at 8); *see Ping v. United States*, 130 U.S. 581, 603 (1889) (holding that the political branches of the federal government have plenary power to determine immigration law and policy as an attribute of state sovereignty).

Indeed, many district courts around the country have applied rational basis review to challenges like Barrera-Vasquez's.[12]

Barrera-Vasquez, in contrast, asks the Court to find the statute unconstitutional under *Arlington Heights*. *Arlington Heights* forbids the application of a statue adopted with discriminatory intent which disproportionately affects racial or ethnic groups of people. Barrera-Vasquez faces a steep hill to persuade the Court to apply *Arlington Heights*, because that case requires proof that the legislature adopted the law with invidious intent.

The Court will examine § 1326 under both tests. Ultimately, under either test, § 1326 survives Barrera-Vasquez's constitutional challenge.

*1. Rational Basis*

Under rational basis review, the Court must "determine whether [§ 1326] is, at a minimum, rationally related to legitimate governmental goals." *Wilkins v. Gaddy*, 734 F.3d 344, 347–48 (4th Cir. 2013). As this Court noted in *Palacios-Arias*, the government undoubtedly has a legitimate interest in deterring illegal reentry into the United States, and § 1326 rationally relates to that interest. "[I]t is plain that § 1326 is a necessary piece of the immigration-regulation framework; without the threat of criminal prosecution that it provides, Congress's immigration-regulation authority would be fatally undermined—all bark and no bite." *United States v. Hernandez-*

---

[12] *Compare United States v. Novondo-Ceballos*, No. 21cr383, 554 F. Supp. 3d 1114, 1119–20(D. N.M. Aug. 12, 2021), *United States v. Samuels-Baldayaquez*, No. 4:20cr83, 2021 WL 5166488, at *2 (N.D. Ohio Nov. 5, 2021), *United States v. Lucas-Hernandez*, No. 19mj24522, 2020 WL 6161150, at *4 (S.D. Cal. Oct. 21, 2020), *and United States v. Amador-Bonilla*, No. cr21-187c, 2021 WL 5349103, at *1 (W.D. Okla. Nov. 16, 2021) (applying rational basis review), *with United States v. Zepeda*, No. cr20-57, 2021 WL 4998418, at *2 (C.D. Cal. Jan. 5, 2021), *United States v. Machic-Xiap*, 552 F. Supp. 3d 1055, 1071–72 (D. Or. 2021), *and United States v. Sanchez-Felix*, No. 21cr310, 2021 WL 6125407, at *3 (D. Co. Dec. 28, 2021) (applying *Arlington Heights*).

*Guerrero*, 147 F.3d 1075, 1078 (9th Cir. 1998). Under rational basis, Barrera-Vasquez's challenge fails.

### 2. Arlington Heights

Framing his argument under *Arlington Heights*, Barrera-Vasquez says that Congress designed § 1326 to discriminate against Latinx immigrants, and that the statute, therefore, violates equal protection.[13] At the heart of Barrera-Vasquez's position lies a simple—but hard to prove—proposition: Congress adopted § 1326 to discriminate against Latinx people. In *Arlington Heights*, "the Supreme Court addressed a claim that racially discriminatory intent motivated a facially neutral governmental action [and] . . . recognized that a facially neutral law . . . can be motivated by invidious racial discrimination." *N.C. State Conf. of NAACP v. McCrory*, 831 F.3d 204, 220 (4th Cir. 2016) (citing *Arlington Heights*, 429 U.S. at 264–66).

> [I]t is because legislators and administrators are properly concerned with balancing numerous competing considerations that courts refrain from reviewing the merits of their decisions, absent a showing of arbitrariness or irrationality. But . . . [w]hen there is a proof that a discriminatory purpose has been a motivating factor in the decision, this judicial deference is no longer justified.

*Arlington Heights*, 429 U.S. at 265–66.

---

[13] Barrera-Vasquez cites various authorities for rejecting the government's position in this case. He first notes that the government relies almost exclusively on cases discussing Congress's power to directly regulate civil immigration. But, he says, "§ 1326 is not merely a civil law that aids in administering the immigration system of the United States. Rather, as a criminal law it authorizes arrest, conviction, and incarceration and results in a host of collateral consequences, including a potential lifetime ban on legally reentering the United States." (ECF No. 22, at 3.) Thus, he argues that his position as a person currently within the United States facing criminal penalties differs categorically from that of a noncitizen seeking to challenge a denial of entry or removal. Moreover, he notes that a divided Supreme Court recently applied the *Arlington Heights* framework in assessing the equal protection claims of noncitizens in an administrative immigration context. *See Dep't of Homeland Sec. v. Regents of the Univ. of Cal.*, 140 S. Ct. 1891 (2020) (applying Arlington Heights to a claim that the Department of Homeland Security's rescission of Deferred Action for Childhood Arrivals ("DACA") violates the equal protection guarantee of the Fifth Amendment).

A disproportionate effect on Latinx immigrants will not carry the day. Indeed, in *Arlington Heights* the Court observed that "official action will not be held unconstitutional solely because it results in a racially disproportionate impact. . . . Proof of racially discriminatory intent or purpose is required to show a violation of the Equal Protection Clause." *Arlington Heights*, 429 U.S. at 264–65 (citing *Washington v. Davis,* 426 U.S. 229 (1976)). "Determining whether invidious discriminatory purpose was a motivating factor demands a sensitive inquiry into such circumstantial and direct evidence of intent as may be available." *Id.* at 266. Because it can rarely "be said that a legislature . . . made a decision motivated solely by a single concern, or even that a particular purpose was the 'dominant' or 'primary' one," "a plaintiff [need not] prove that the challenged action rested solely on racially discriminatory purposes." *Id.* at 265. "To plead animus, a plaintiff must raise a plausible inference that an 'invidious discriminatory purpose was a motivating factor' in the relevant decision." *Regents*, 140 S. Ct. at 1915 (quoting *Arlington Heights*, 429 U.S. at 266).

> In *Arlington Heights*, the Court set forth a non exhaustive list of factors to consider in making this sensitive inquiry. These include: "[t]he historical background of the [challenged] decision"; "[t]he specific sequence of events leading up to the challenged decision"; "[d]epartures from normal procedural sequence"; the legislative history of the decision; and of course, the disproportionate "impact of the official action—whether it bears more heavily on one race than another."

*McCrory*, 831 F.3d at 220–21 (quoting *Arlington Heights*, 429 U.S. at 266–67) (alterations in original). If a law's challenger produces evidence that a discriminatory purpose motivated a law's passage, then the burden shifts to the government to prove that the legislature would have passed the law "even had the impermissible purpose not been considered." *Arlington Heights*, 429 U.S. at 270 n.21.

### i. The Continuing Effect of the Undesirable Aliens Act of 1929

Barrera-Vasquez first argues that "[a] close examination of the political context underlying

8

the criminalization of illegal reentry in 1929 reveals . . . that racism and eugenics . . . were the *primary* factor" motivating the passage of UAA. (ECF No. 14, at 5 (emphasis in original).) In support, he provides a significant summary of the law's political and legislative history. Barrera-Vasquez also points to the Department of Justice's concession in *Carrillo-Lopez* that "the 1929 reentry law was motivated by racial animus." (*Id.*)

"Inquiries into congressional motives or purposes are a hazardous matter." *United States v. O'Brien*, 391 U.S. 367, 383 (1986). Nevertheless, under *Arlington Heights*, the Court may appropriately consider the historical background of § 1326 as one factor in its analysis. The Court has reviewed the record and now joins several other district courts in acknowledging the troublesome historical record surrounding the UAA.[14] Bald ethnic animus appears frequently throughout the record and undoubtedly undergirded many immigration policies of that era. The Court, however, remains unpersuaded either that the history explains why the 82nd Congress passed § 1326 some twenty-three years later or that it renders the modern law presumptively unconstitutional.[15] "Just as 'the views of a subsequent Congress form a hazardous basis for inferring the intent of an earlier one,' the views of an *earlier* Congress 'form a hazardous basis for inferring the intent of' a later one." *Palacios-Arias*, Civil Action No. 3:20cr62, ECF No. 37, at 7 (E.D. Va. Oct. 13, 2020) (quoting *United States v. Price*, 361 U.S. 304, 313 (1960)).[16]

---

[14] *See. e.g.*, *United States v. Suquilanda*, No. 21cr263, 2021 WL 4895956, at *5 (S.D. N.Y. Oct. 20, 2021); *United States v. Gallegos-Aparicio*, No. 19cr2637, 2020 WL 7318124, at *3 (S.D. Ca. Dec. 11, 2020).

[15] Barrera-Vasquez makes no effort to address the subsequent reauthorizations of § 1326 in the decades since 1952.

[16] Further, as this Court noted in *Palacios-Arias*, the 70th Congress, which passed the UAA in 1929, shared only twenty-one members with the 82nd Congress, which passed the INA in 1952. *See 70th Congress (1927–1929): Congress Profiles*, History, Art & Archives: United States House of Representatives, https://history.house.gov/Congressional-Overview/Profiles/70th/ (last visited

Barrera-Vasquez contends, however, that two recent Supreme Court cases give new life to old discriminatory intent. For this argument, he relies on *Ramos v. Louisiana*, 140 S. Ct. 1390 (2020), and *Espinoza v. Montana Department of Revenue*, 140 S. Ct. 2246 (2020). *Ramos* and *Espinoza*, however, do not stand for the propositions Barrera-Vasquez says they do.

In *Ramos*, a criminal defendant was convicted by ten members of a twelve-person Louisiana jury, and the court sentenced him to life in prison without the possibility of parole. On appeal, Ramos argued that the Sixth Amendment right to a jury trial requires unanimous verdicts. The Supreme Court agreed.

*Ramos* bears little, if any, resemblance to the case before the Court. First, *Ramos* was not an equal protection challenge, and the Court never mentioned *Arlington Heights*. In *Ramos*, the Court said that "Louisiana . . . frankly acknowledged that race was a motivating factor in the adoption of [its] . . . nonunanimity rule[]." 140 S. Ct. at 1394. But the Court held that "a jurisdiction adopting a nonunanimous jury rule *even for benign reasons* would still violate the Sixth Amendment." *Id.* at 1401 n.44 (emphasis added). And the Court has long held that it is "plainly competent for congress to declare the act of an alien in remaining unlawfully within the United States to be an offense punishable by fine or imprisonment." *Wong v. United States*, 163 U.S. 228, 235 (1896).

*Espinoza* also does not support Barrera-Vasquez's position. In *Espinoza*, the Court reversed a Montana Supreme Court decision striking down a state scholarship program that excluded students attending religiously affiliated private schools. *Id.* at 2263. The Court based its

---

on July 26, 2022); *82nd Congress (1951–1953): Congress Profiles*, History, Art & Archives: United States House of Representatives, https://history.house.gov/Congressional-Overview/Profiles/82nd/ (last visited on July 26, 2022).

decision on the Free Exercise clause and did not address whether the state constitutional provision violated the Equal Protection Clause. *Id.* at n.5.

Adoption of Barrera-Vasquez's argument would freeze the INA's illegal reentry provision in time and bind it forever to its 1929 predecessor, no matter how much time may pass or how many times Congress alters or reaffirms it, absent substantial change or "debate or discussion of the invidious racism that motivated the [UAA]." *Carrillo-Lopez*, 555 F. Supp. 3d at 1020. The Court believes such a result runs contrary to well-established precedent. *See, e.g., Abbott v. Perez*, 38 S. Ct. 2305, 2324–25 (2018) (quoting *Mobile v. Bolden*, 446 U.S. 55, 74 (1980)). Accordingly, it respectfully declines to follow *Carrillo-Lopez* to find that the 1929 statute taints the current law.

### ii. The Immigration and Nationality Act of 1952

Finally, Barrera-Vasquez alleges that a discriminatory purpose also motivated Congress to pass § 1326 in 1952. In support, he provides a summary of the "historical events that bridged 1929 and 1952," including Mexican repatriation during the Great Depression, the Bracero Program, and the segregation of schools and public facilities. (ECF No. 14, at 21–24.) He also briefly addresses the legislative history of the INA.[17] (*Id.* at 16–19.) Absent from the record, however, is any meaningful evidence reflecting the motivations of the Congress who passed § 1326 or any of its subsequent reauthorizations and amendments. Further, Barrera-Vasquez presents no evidence that Congress departed from normal legislative processes when it passed § 1326. The record, largely dedicated to analyzing the history of a discrete piece of legislation and significant historical events untethered to the legislators who passed the INA, does not reveal that anti-Latinx sentiments motivated Congress to pass § 1326.

---

[17] Barrera Vasquez also details the history of the so-called "Wetback Bill," passed several months before the INA. (*Id.* at 19–21.)

Barrera-Vasquez argues that the 1952 Congress knew of the law's "disparate impact" because it "heard from the prosecutors and enforcers of [the] law." (*Id.* at 18.) But just as evidence of a disparate impact itself is not enough to doom a law, evidence that legislators knew of the UAA's effects is insufficient to tar the motivations of the 82nd Congress. Barrera-Vasquez's argument is void of "contemporary statements by members of the decision[-]making body" and leaves this Court to the guesswork of divining their intentions. *Arlington Heights*, 429 U.S. at 268.

Barrera-Vasquez also contends that the only change to the law's language came at the behest of Deputy Attorney General Peyton Ford, who requested Congress amend the the law "to make being 'found in' the United States a crime so as to make prosecution possible" when the Immigration and Naturalization Service could not "establish the place of reentry." (ECF No. 14, at 18.) He argues that Ford's documented use of an anti-Mexican slur is evidence that Congress adopted both his proposed verbiage and his alleged bias when expanding the law. The government disputes the accuracy of Barrera-Vasquez's recitation and asserts that the "[found in] clause was already present in the bill [Ford] received for review." (ECF No. 19, at 38.) Yet, even if the Court accepts Barrera-Vasquez's version of events, it can assign them little weight. For "what motivates one legislator to [speak] about a statute is not necessarily what motivates scores of others to enact it," and Ford was not even a legislator. *O'Brien*, 391 U.S. at 384; *see also Machic-Xiap*, 552 F. Supp. 3d at 1076 ("Because Ford was not a member of Congress, however, his use of the epithet is limited evidence of Congress's purpose in enacting § 1326.").

Barrera-Vasquez paints a vivid portrait of how discrimination manifested throughout the years between 1929 and 1952. But these events, while not entirely without relevance, shed little light on the motivations of the congressmen who passed § 1326. "Although the history of racial discrimination in this country is undeniable, we cannot accept official actions taken long ago of

evidence of current intent." *McCleskey v. Kemp*, 481 U.S. 279, 298 n.20 (1987). The government contends that "Congress's repeated efforts—over the course of multiple decades—to strengthen the law against unlawful reentry underscores the implausibility of Barrera-Vasquez's claim that Congress has been acting out of a discriminatory animus, rather than seeking to address the lasting[] and difficult problem of illegal immigration." (ECF No. 19, at 16.) This Court agrees.

Lastly, Barrera-Vasquez argues that § 1326 continues to disparately affect Mexican and Latinx persons today. Undoubtedly, § 1326 has a disparate effect on persons coming from Mexico and Latin America. This Court joins several others in concluding that "any disparate impact is . . . explained by the geographic proximity of the border to Mexico and Latin America than by animus." *Lucas-Hernandez*, 2020 WL 6161150, at *3 (citing *Regents*, 140 S. Ct. at 1915–16).[18] "Were this fact sufficient to state a claim, virtually any generally applicable immigration policy could be challenged on equal protection grounds." *Regents*, 140 S. Ct. at 1916. Accordingly, this factor does not tip the scales in Barrera-Vasquez's favor.

Barrera Vasquez has not offered adequate proof that a discriminatory purpose motivated Congress to pass § 1326 or any of the amendments to the law. Thus, the Court does not find that the statute violates equal protection and must deny his motion. *See Arlington Heights*, 429 U.S. at 265–66.

\*       \*       \*

Even if Barrera-Vasquez adequately showed that discrimination was one factor motivating Congress's passage of § 1326, the Court would still deny his motion. Under *Arlington Heights*, §

---

[18] In *Regents*, the Court concluded that any disparate impact on "Latinos from Mexico [as a result of the DACA rescission] did not establish a plausible equal protection claim 'because Latinos make up a large share of the unauthorized alien population, [and] one would expect them to make up an outsized share of recipients of any cross-cutting immigration relief program.'" *Id.* (citing *Regents*, 140 S. Ct. at 1915–16).

1326 survives if the government demonstrates that Congress would have passed the law even if Congress had not considered "the impermissible purpose." *Id.* at 270 n.21. The Court finds that the government has made such a showing here.

First, the government points to the Senate Report from the Committee on Immigration outlining the purpose of the UAA.

> [T]here is no provision of law under which a penalty, other than repeated deportation, can be imposed on aliens who have been expelled from the United States and who reenter the country unlawfully. It frequently happens that aliens of the criminal and other classes who are deported under the general immigration law reenter the country unlawfully. As a matter of fact, in some instances such aliens have been deported four or five times, only to return as soon as possible to the United States in an unlawful manner . . . It is believed that such a statute would be of material aid in enforcing our immigration laws.

(ECF No. 19-13, at 2.)

Next the government points to evidence that although the 82nd Congress did see marked debate around the national origin provisions of the INA, § 1326 "was not debated because almost everybody appeared to agree that it should be passed." (ECF No. 19, at 31.)

Finally, the government notes that,

> Congress has [repeatedly] increased § 1326's deterrent value while simultaneously eschewing forms of racial discrimination. For example, in the Immigration Act of 1990, Congress amended [§] 1326 to authorize greater fines . . . [and i]n the same Act, Congress more than doubled the[] then-existing cap on immigration, granted Temporary Protected Status to citizens of El Salvador fleeing that country's civil war, and created a diversity visa program to increase the number of visas provided to countries that were underrepresented.

(*Id.* at 40.) Based on the record before the Court, it concludes that the government has provided sufficient evidence that Congress would have passed § 1326, and its later amendments, in the absence of any discriminatory intent. Accordingly, even if Barrera-Vasquez met his initial burden under *Arlington Heights*, his challenge would still fail.

## III. CONCLUSION

For the reasons set forth above, Barrera-Vasquez's claim fails even under *Arlington Heights*. Accordingly, the Court will deny his motion.

The Court will issue an appropriate Order.

Let the Clerk send a copy of this Memorandum Opinion to all counsel of record.

Date: 28 July 2022
Richmond, VA

/s/
John A. Gibney, Jr.
Senior United States District Judge